We have five cases on the calendar this morning. Three patent cases, two from district courts and one from the PTAB. A case from the Justice Department and a case from the Court of Federal Claims. And the last two are being submitted only in the briefs and therefore will not be argued. Our first case is Netflix v. Rovi et al., 2015-19-17. Mr. Lampton. Good morning and may it please the Court. Section 101 law has developed substantially since the district court ruled, and indeed since we submitted our briefs. For the 906 patent in particular, two salient principles apply. First, claims that resolve a technological problem in a technological industry are particularly likely to be patent eligible. Second, there's a common sense distinction between improvements to our existing tools, on the one hand, and the pursuit of abstract ideas like organizational practices, hedging methods, business methods, that simply utilize our existing tools to effectuate a process that's involved in those processes. Look, claim one of the 906 patent claims delivering media, recording a bookmark and delivering media to a second client. That sounds pretty abstract. Your Honor, actually there's five specific limitations I'd like to go over to show that this is actually an ordered combination, an unconventional combination. First, we're taking the media and it's not on the local device anymore. You've put it on central storage. Second, it requires something called identified device properties. This ensures that your server, which now has the media, can send it in a way that is configured for the particular device. This is solving the problem of the fact that we have incompatible device types. Third, each of your devices has to be associated with a user. That's actually quite critical because if I'm sitting down and watching Magnificent 7 in my living room on TV and then I want to pick up on my iPad or my Android or my computer in the airport, this system isn't going to work unless it knows that it was me watching on TV Magnificent 7 in the morning and it knows that it's me again on that Kindle or iPad or Android in the airport. Fourth, the media has to be delivered in a format configured that is compatible with the device type. So the work of the configuration isn't being done in the device. It's not being done locally. That work is actually done at the server. Fifth and finally, now we get to the universal cross-device pause and resume. You record an identifier that specifies the place in the media and that allows you to pick up where you left off. Are all these advantages in the claim? Yes. These distinctions? Pardon? All of these distinctions? Yes, these are all in the claim. So for example, if you start with claim 1, which is column 12, appendix page 69, when it says delivering media, this is about line 48, it says delivering the media to a first client device through a first communications link. So we're in a client-server setup. The media is being delivered across a link to a client device. So that's the first thing that I mentioned. Second, it says in a format compatible with identified device properties. That's again line 49. Identified device properties. Critical again to make sure that it is formatted in a way that is consistent. Didn't your own inventors concede that all of these are conventional elements? I think that individually each of these elements is sufficiently well established that you didn't have to go into detail on how to do them either in the claim or the spec. I think it's the order combination that makes the difference here. It's the unconventional combination of taking your media, moving it to another location, taking your configuration, doing it not at your set-top box, not on your laptop, not someplace else, but doing the configuration at the central location. I guess here's my problem with the way you're explaining it. There are admissions in this record that each individual element is conventional, but you're saying the ordered combination is not conventional. So I don't know what to make of this because there are four different system models in this patent that are discussed, and each one involves a bookmark, but the bookmark is only on the user device. What I see no evidence anywhere in the record of is that it was conventional to store a bookmark on a server to be able to be downloaded to a different device. That's an element. That's not the whole claim. But you've conceded that each element is in fact conventional, but one element would be recording a bookmark, specifying a position in the media, and in your media on-demand system, which the district court has treated those words in the preamble as a limitation and actually construed them in a way I don't agree with, by the way, but you didn't object to. Nonetheless, this claim requires storing a bookmark on a server. I see no evidence anywhere that that is conventional, yet that's not the way you've argued your case, so I don't know what to do about that. Your Honor, I don't think we treated the bookmark. We argued that the bookmark itself was not conventional, and a pause and resume that works across devices is not conventional. In fact, the spec does make clear that you have to store it on the server. It says you can store it in memory on the server. In order to do it, that's on page, I think it's column 7, line 66 to 67. Figure 4 shows you that unconventional bookmark. I don't think, truthfully, while we've conceded individual things like having a pause and resume is conventional, the way pause and resume is done here across devices and holding it on the remote with the media is not. But it doesn't explain. You say compatible with identified device properties of said first client device, but there's nothing in the claim or even in the specification that explains how it's compatible. Right. I think the specification gives you the sorts of criteria that are necessary for it to be compatible in terms of formatting, bit rate, and things like that. That isn't explained in the claim itself because that's the sort of thing an unskilled artisan would know how to do. I think the Alice step 1 in particular is not designed to require you to put all the hows of each step when you have a multi-step process in the claim. I think that's actually particularly clear from here. There has to be something beyond just things that are conventional and common, right? No, Your Honor. No, the order combination can be unconventional, and even if you have all the individual limitations are simply described in generic terms. I think the proof of that is actually Deere itself. If the court were to look at the claims in Deere, and I'll give you a quick summary of some of them, Deere itself had the steps of close the mold, didn't tell you how. Set an interval timer on closure, didn't tell you how. Constantly determine the temperature of the mold as close to the mold cavity as possible, claim didn't tell you how. Feed the temperature to the computer, it didn't tell you how. Have the computer repetitively use the well-known Arrhenius equation to calculate the cure time, didn't tell you how to program the computer. Open the mold when the solution to the equation matches the elapsed time, it doesn't tell you how. We know that in your case. Do you want to deal with the 709 patent? Certainly, Your Honor. I'm happy to deal with the 709 as well. I'll be candid about the 709, frankly, Your Honor. I think at least for purposes of step one, the intervening case law has made step one of Alice more difficult for us on the 709. This court's treatment in particular of patents that deal with data, analysis of data, and outputting results has made it harder. But this is, at least for Mayo step two, a technological advance in the art of interactive program guides. We take the interactive program guide, which is formally just a way of you navigating, and it passively allows you to find the things you want. And it converts the guide from a passive navigator into an active entity that tells you things you might like. It does something that previously required the exercise of human judgment, and it allows it to do it through an objective program that's set forth in the claim. It has to use particularized databases. It has a viewing history database with user watched and associated program criteria. Very specific in that sense. What you watched, associated program criteria. There's a user preference profile, information about your preferences. There's a database of programs not watched, and then it has to go through a specific process using those particularized databases in order to generate the view and recommendation. You start with the viewing history. You look at the associated program criteria that are there in that same database. And you identify a program from the, you identify criteria from the viewing history, and you find something that matches the user preference profile. Then you use that, and you find something that has been watched, and you recommend that to the viewer. So what's the, what is the technological solution for doing any of these things? In terms of the technology involved, the use of databases and things like that, we can't claim that suddenly databases, we've invented them. But the particular format and process you go through in using the databases is an unconventional combination that produces a result. But there's no technical solution to defining the program criteria. I mean, I don't see anything in here that does anything other than say that there's going to be criteria. Your Honor, it is correct. In some senses, this is less specific. If it went through and said, well, the program criteria will consist of the following six factors, that would be more specific. That would be better for us. But the actual process in the database of having a database with the viewing history and program criteria, associated program criteria there, and people would generally know that means Western, 1960s, director, cast, that's all set forth in the specification. That is something that's novel, and that's something that's just not the traditional way of doing it. And, in fact, there was no traditional way of doing this when this patent came out. Remember, this patent comes from 18 years ago, 1998. We're almost nine years away from the first iPhone. The model for people having media is for Netflix to federal express you a disk. Right, but just because something might be a good idea doesn't mean that it falls under the criteria under 101. There's nothing that tells us how any of these things are accomplished other than through the use of a database. Well, I think that actually overgeneralizes a little bit because it specifies the types of databases you need and what needs to be in them. Three specific databases, an ordered process by which you actually go through those, and it tells you what needs to be in each. You have to have the viewing history and the associated program criteria, so things that describe what was watched along with what the person has watched. You also have to have your user preferences, a separate database. You start with the first one, and you match to the user preference profile. Then you go from that one, and you try and match the criteria to criteria in something that has been watched. Those are specific steps. It might not be that we need to develop a brand new computer to do it, but that is the type of leap forward in your interactive program that we're now all used to. But in the day, it was quite a feat. Counsel, you wanted to say some rebuttal time. You're into it. Oh, thank you. You can continue or save it. No, no, I'd like to save my time for rebuttal. I appreciate the warning. Thank you. Mr. Kwon. Mr. Kwon. May it please the court. I want to address a few issues that have come up during the argument. First of all, to address Judge Moore's point about the bookmark and whether or not storing a bookmark on the server would be unconventional. The bookmark in the conventional use in an actual book, you put the bookmark in the book itself. You always store conventionally the bookmark where the media is. So what we have here in the 906 is that the media is being streamed using conventional techniques, admittedly conventional techniques, which means the media is stored on the server. Therefore, the conventional approach would be to store the bookmark on the server. There is nothing unconventional about that approach here. What would be unconventional? No, the specification says at column 7, line 66 to 67, significantly MODS 100 can store bookmarks within the local memory of the MODS 100. MODS 100, ISP 300, IMA 600, those are all, unless I'm mistaken, those are all servers, every one of them. And I don't think this patent ever discloses storing a bookmark in the media, ever, anywhere, and every single embodiment, and there are many, discloses storing the bookmark on the server. It doesn't say storing the media in the server and it happens to contain a bookmark in the media. It expressly says storing the bookmark on the server, every embodiment. In fact, there's no embodiment in this patent that discloses storing the bookmark in the media, none. So I would actually posit that there could be a written description problem if they tried to claim that this patent covered storing the bookmark in the media. Well, Your Honor, perhaps I've spoken precisely and I apologize. The media is being streamed from the server. So it's, you're correct. It does not require that the bookmark be stored literally in the same file as the media, but it's stored in the same. So this isn't like your example where you stick a bookmark into a book, right? That's correct. That example is, in fact, not at all disclosed in this patent or relevant to what is disclosed in the patent. So when you stood up and said this is just like when you put a bookmark in a book, in fact, this is nothing like when you put a bookmark in a book. Putting a bookmark in a book is not at all even close to what's disclosed in this patent. Respectfully, Your Honor, I think putting the bookmark on the server side is much closer to putting the bookmark in the book. No, what this is really like is I stopped reading at page 57 and since I didn't have a bookmark handy, I took my phone. And on my phone, I typed a note in for myself, resume at page 57. That's the kind of bookmark this is, because it's storing a location to resume playing in a separate part of memory on a server from the media itself, and every embodiment discloses that. So why doesn't that make this nonconventional? Because there is no evidence that Netflix has presented that demonstrates that storing bookmark locations on servers was conventional. Your Honor, the best I can do on that is to say that between the choice of storing it on the client or storing it on the server, the closer analogy to the conventional methods that have been used in physical media is to store it on the server rather than on the client. But you're correct that there is not a directly analogous point to storing the bookmark literally inside the book. But Your Honor, the- So did you just- I don't understand your answer. I think there's a nonconventional element here in this claim. I think the bookmark is required to be stored on the server. And if that's true, doesn't that end your case? What am I missing? Because under Alice, if there's a nonconventional aspect, an element of this claim, a new widget, a new steering wheel, a new motor, or something that hasn't previously existed anywhere in the prior art or been demonstrated to be conventional, then we're outside the boundaries of Alice as far as I can tell. Well, Your Honor, the other point is that while there may have been some passing references to the notion of the bookmarking invention here not being conventional, the argument that you have presented was not actually raised in the opening brief or in the reply brief. But, Your Honor, the other thing here is that in order for an ordered combination to survive at step two, it has to have something significantly more than the abstract idea itself. And I would posit that it has nothing more than the abstract idea itself or, alternatively, that it certainly has nothing significantly more than the abstract idea itself. Are you relying primarily on the many, many concessions that come from the inventors themselves about the conventionality of all of these elements? I think that that is the strongest evidence. And then beyond that, I would add that at appendix page 67, in column 7 at approximately line 25, the specification, the written description, makes clear that there are various methods that are well known in the art that can be used to authenticate and grant access to particular network services. And I believe that addresses the point raised regarding the fact that the bookmarks must be associated with a particular user. Those methods are going to involve authentication, which has been, as the specification notes, well known in the art. You're not really arguing that the specification is irrelevant to this 101 analysis, are you? I don't think the specification is irrelevant to this analysis, but I do think that the concessions that are made by the inventors themselves and submitted to the PTO are relevant to determining what is conventional. Right, but they're both relevant. I mean, in Enfish we specifically said that, yes, the claims, you have to look to see what is actually claimed. You can't just say, is there some invention in here that we can ferret out of the specification or the written description. But clearly we look at both. Yes, Your Honor. To help define the claims. Yes, Your Honor, without a doubt. But if the specification were to attempt to contradict the points that the inventors themselves made in their own invention disclosure to their employer and subsequently submitted to the PTO, I think it would be hard to take that at face value. But here, there actually is nothing in the specification that contradicts the admissions that are made in the invention disclosure that was submitted to the PTO. So, Your Honor, and the other note that I would raise is that in the BiSafe case, this court noted that even groundbreaking, innovative, or brilliant ideas can still be abstract. That, of course, comes from the Myriad case. I don't think we have anything here that's necessarily groundbreaking, innovative, or brilliant. But the key point is that there is little, if anything, in the claims that goes beyond the abstract idea itself of bookmarking across devices. It's pretty cool, though. It might be cool, Your Honor, but I don't think that cool necessarily means that you're not an abstract idea. Is the media-on-demand system in the preamble a claim limitation? No party took the position that it was limiting. No party asked the district court to construe it as being limiting, and, indeed, there was no claim construction suggesting that it was limiting. Your Honor, however, I would say that if you look at Figure 1 in the patent, which is at the appendix at page 58, this is an illustrative hardware setup implementing the supposed invention. What we can see here is that the media-on-demand server is illustrated as Item 100. It's a generic-looking server, and that the client devices are in 120 and 110. In both of those, one of the choices is a generic PC. Oh, I don't disagree with you that the components are generic at all. I'm still stuck on my point, which is this is a, while they are generic, they are collected in a way and utilized in a manner that is nonconventional with the bookmarking capability. So I'm still stuck on my original point. I mean, I know you've moved beyond it and you're talking about lots of other things, but I'm still stuck there with the idea that the media-on-demand server makes this clearly a server-side, server-required, and server-implemented device. And so I personally look at that claim limitation and think that it limits the claims to server-side storage, server-side transfers, and all of that. And that's why, to the extent that the patent talks about four embodiments, which have bookmarking capability in the prior art and things, it's always non-server related. So it's not that the server is not a conventional device. It's that the media transfer on the server is nonconventional. On that point, I would again note that the appellant needs to be limited to the arguments that they've made in their briefs, and neither in their opening brief nor their reply brief is there a position taken that the inventive step is server-side bookmarking. And their expert who submitted a declaration, his position was not that server-side bookmarking was the point of innovation or the point of inventive concept. Well, no, it's the collection of things that are the inventive concept, but that could be a new aspect, a new element. It's the collection of the way that the system operates. Yes, Your Honor, but I don't think that there is anything in Professor Seamus' declaration that suggests that the ordered combination is an inventive concept because of the concept of server-side bookmarking. If I could turn to the 709 patent. The 709 patent, I think the key is that the ordered combination here includes some elements that arguably go beyond the abstract idea themselves, but they are themselves utterly conventional. It specifies that you must use a viewing history, and it specifies that you must use a user preference profile. Those, however, are precisely the types of information people have always used when making recommendations to their friends and family. They rely on what they know that the person that they are making a recommendation to has viewed in the past, what they have liked in the past, and they try to suggest something to them that they haven't already read or seen, which is to say they try to recommend something that has not yet been watched. And I think that this distinguishes the additional limitations from, for example, the McGrow case. I think the distinctive point in McGrow was that when going from the human process of animating to the computerized method of animating, it was unobvious and unclear what human beings actually do. As you may recall from the case, it discusses that the key point was, how do you choose key frames in animation? And the key frames in the prior art, in the human-based method, involved human animators deciding what the key frames should be and what they should look like. And, of course, the way a human being is going to do this is you're going to think about the word that you're trying to animate, and you're going to think about what your own face looks like when you are at a certain spot in that word, and you're going to choose that as a key frame. Human beings don't consciously make choices about morphoid sets and what phonemes they are between in a particular sequence. A computer cannot access its own personal experience in how it's going to form those phonemes. And that is why you need to come up with an inventive concept to figure out how to computerize that process. Here in the 709 path, the precise information that is being relied upon is that which is known to anyone who has made recommendations to their friends or family. The other thing that I would suggest about both of these patents is in contrast to a case like EnFish, for example. In EnFish, the innovative concept was something that improved the functioning of the computer itself. And that was, of course, the self-referential table. And that improved on the prior art, which required that you, ahead of time, decide what types of information you're going to try to capture so that you can create separate tables in a relational database that allows that information to be correlated. The invention in the EnFish case was that by using a self-referential table, that process was no longer required. And on the fly, one could add information that introduced new categories that you wanted to correlate. So could you have something that, like, if you say, this initial bookmarking would not be patent eligible, but an improvement to that bookmarking system could be? Well, potentially. Certainly under a case like EnFish, if they came up with a way that actually improved the functioning of the computer, as opposed to coming up with a way to implement the abstract idea itself, that might be something useful. There's nothing in the claims and nothing in the specification that talks about how to improve the functioning of the computer, as opposed to merely taking the abstract idea and placing it in the new technological realm of a client-server-based system. And unless there's further questions, I'm prepared to submit. Thank you, Mr. Kwon. Mr. Lampton has some more questions. Mr. Lampton, before you start on what you want to say, one of the things that I thought was kind of surprising, aside from the fact that you had so many concessions by your own inventors about everything being conventional, is that Dr. Shamos' report, if you look at it, it is sort of the classic, well, the reason this is patent eligible is because you need specially programmed computers. You know, Allopat, that was a long time ago, and Alice has sort of morphed us away from that. So isn't that the exact kind of language that gets you nowhere? I think the problem is that 101 law has moved substantially since when we were litigating in the district court, since the district court ruled, and even since we litigated this case. Oftentimes we're thinking in the old world of tying it to a machine. The new world is very different, and the new world makes a difference when, for example, you have to look and find your individual steps, emphasize the individual steps, identify whether any are unconventional, identify whether the order combination is unconventional. That's a slightly different world than we had when we were back in the district court. So you wish you could go back and re-litigate this? Well, certainly, Your Honor. I think it's a little unfair even to the district court, Your Honor, to review it under current law with things changing even the past six months as opposed to what the law at the district court had at the time. And so one solution that could be proposed would be just to send this back to the district court to think again in light of the precedent that has gone by. But I did want to sort of turn away from that one little piece of it and actually talk for a minute about one question, which was— But is there anything that Dr. Shamos said other than those things that I think get you nowhere that you would be relying on right now? I think Dr. Shamos talked about the fact that we were actually modifying the media in a way that wasn't done previously and making modifications in a way that wasn't done previously in terms of the bookmark. But he said the reason it was is because you have to have specially programmed computers. Right, but it also wasn't done the old way. The old way was you press a button, the mechanical linkage lifts, and you have paused. The needle lifts. This is a very different world where you have to have some sort of a counter, and we not only have that counter, but as Judge Moore pointed out helpfully, we take that counter or the bookmark, and we have a diagram of what the bookmark looks like, and you move it to the remote location. And it's not just that it's on the server, but as Judge Moore pointed out, in column 8, you put it on an ISP. Column 10, you put it on what's called an internet media aggregator. You take it away from the device along with the media. You're taking a lot of things away from the device, and this is a way of making the device work seamlessly as if you had the document on the device, but in fact everything has been removed remotely. Judge Moore, I wanted to answer your question about whether the media on demand server is a limitation, and I think the answer is Claim 1 it clearly is because it actually says a client device. Unless you have a media on demand system, you don't have a client device. If there were any question, it would be resolved by Claim 3, which actually says the method of Claim 1 wherein the media is stored on a media on demand server. Finally, I just wanted to go back to where I began, which is to say there's two things that really stand out. The Supreme Court and this court formally had been invalidating numbers, calculations of numbers, business methods, and things like that. We've now moved a little bit beyond it. The question here is how far do you go? Well, the law hasn't changed. It's just that new cases have come up with new facts. That's correct. Oftentimes, this court has to operate by comparing one case to the prior cases, but the analysis has changed. We now in the past six months have seen analysis that says, hey, look, if this is a technological solution or if this is a solution to a technological problem, you're probably going to get past Mayo and Alice Step 1. If this is something that rather than being an effort to use existing conventional machines to effectuate what is an abstract idea, effectuate a business method, but instead you're improving or changing how these machines operate to achieve a goal, that's going to be patent eligible. And here we're changing the way your server operates, changing the way the client and the server interact, changing where things are stored in order to solve a problem, which was the incompatibility of devices and the inability for you to move, start on one device and then pick up seamlessly on another device that's potentially incompatible over an entirely different link. If there are no further questions, I thank the court. Thank you. Mr. Lamkin will take the case under advisement.